RECEIVED
IN LAKE CHARLES, LA
MAR 19 2009
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| UNITED STATES OF AMERICA | : | DOCKET NO. 2:06 CR 20103-005 |
|---|---|---|
| VS. | : | JUDGE MINALDI |
| RICHARD W. TOWNLEY | : | MAGISTRATE JUDGE KAY |

MEMORANDUM RULING

Presently before the court are objections by both the Government and the defendant, Richard W. Townley ("Townley"), to the Presentence Report ("PSR") prepared by the Probation Department.

After receiving objections by the Government, Probation revised the PSR to incorporate the information provided. This does not require a ruling by the court.

Townley objects to ¶¶ 9, 10, 11, 17, 22, 29, 33 and 39 of the PSR which assert that Townley was responsible for harboring more than 100 unlawful aliens. He argues that the Government did not prove beyond a reasonable doubt the actual number of aliens.

Even in the discretionary sentencing system established by *Booker/Fanfan*, a sentencing court must still carefully consider the detailed statutory scheme created by the Sentencing Reform Act and the Guidelines, which are designed to guide the judge toward a fair sentence while avoiding serious sentence disparity. Although *Booker* excised the mandatory duty to apply the Guidelines, the sentencing court remains under a duty pursuant to § 3553(a) to "consider" numerous factors including the following:

(4) the kinds of sentence and the sentencing range established for-

(A) the applicable category of offense committed by the applicable category of defendant as

set forth in the guidelines-

(I) issued by the Sentencing Commission....

(5) any pertinent policy statement-

(A) issued by the Sentencing Commission ....

18 U.S.C. § 3553(a)(4), (5).

This duty to "consider" the Guidelines will ordinarily require the sentencing judge to determine the applicable Guidelines range even though the judge is not required to sentence within that range. The Guideline range should be determined in the same manner as before *Booker/Fanfan*. Relatedly, *Booker* contemplates that, with the mandatory use of the Guidelines excised, the Sixth Amendment will not impede a sentencing judge from finding all facts relevant to sentencing. 125 S.Ct. at 750, 764. The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range and all facts relevant to the determination of a non-Guidelines sentence.[1] *United States v. Mares*, 402 F.3d 511, 518 -519 (5th Cir. 2005).

Relevant conduct is also relevant to the question of the number of illegal aliens. U.S.S.G. §1B1.3. Relevant Conduct (Factors that Determine the Guideline Range) states:

> **(a) Chapters Two (Offense Conduct) and Three (Adjustments).** Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

---

[1] Under U.S.S.G. § 6A1.3(b)(2004), which remains in effect, the district court is required to "resolve disputed sentencing factors ... in accordance with Rule 32(i), Fed.R.Crim.P." The Commentary to this Guideline provides for use of the preponderance of the evidence standard.

(1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4) any other information specified in the applicable guideline.

**(b) Chapters Four (Criminal History and Criminal Livelihood) and Five (Determining the Sentence).** Factors in Chapters Four and Five that establish the guideline range shall be determined on the basis of the conduct and information specified in the respective guidelines.

USSG, § 1B1.3, 18 U.S.C.A.

It is Probations's position that several confidential informants and anonymous sources had reported from 50 to over 200 illegal aliens housed in a warehouse on Opelousas Street in Lake Charles, Louisiana. Co-defendant Sergio Alire was recorded stating to confidential informants that he housed over 200 illegal aliens on at least one occasion, and on another occasion, he admitted to

approximately 180 illegal aliens. These facts were supported by the evidence introduced at trial.

The PSR and the evidence introduced at trial established in excess of 100 illegal aliens. All of the information contained in the PSR was derived from investigative reports from the Department of Homeland Security, Immigration and Customs Enforcement (ICE). In addition to the investigative efforts of local law enforcement officials and agents of federal law enforcement agencies, the reports also include information obtained from interviews with co-conspirators, both indicted and unindicted.

These reports indicate that on April 25, 2006, ICE agents were contacted by the Fort Polk Provost Marshal's Office concerning five (5) aliens, detained for attempting to unlawfully enter a military base. A search of Immigration databases resulted in no identifiable match to the aliens in custody, but later, three of the aliens were determined to be lawfully present in the United States and were released from custody. The remaining two subjects, Mexican nationals Adelimiro Camara-Pineda and Romeo Galvez-Roblero admitted to entering the country illegally. Camara-Pineda and Galvez-Roblero advised they were employed by Dunham Price for the past five and seven months respectively, earning $9.00 per hour and were housed in a company trailer. They were not required to provide any documentation to work for Dunham Price and both aliens believed their employer to be aware they were illegally in the country. They named Sergio Alire as their supervisor.

In April 2006, Border Patrol agents became involved with an investigation by the Lake Charles Police Department of two subjects arrested for Driving Under the Influence and Hit and Run. The two defendants admitted they were illegally present in the United States. They presented employment cards from American Workforce Solutions ("AWS") (also known as International Workforce Solutions) and stated their boss was Sergio Alire. The aliens took police officers to a warehouse

located at 5505 Opelousas Street, Lake Charles, Louisiana. The warehouse was lined with bunk beds, stacked end-to-end and side-by-side, with only enough room to walk between the beds. Over fifty (50) Hispanic males were in the sleeping area, none of whom spoke English. The sleeping area appeared to accommodate approximately one hundred (100) men. Also on the property at the Opelousas Street site were three trailers, used as sleeping quarters similar to the warehouse. It was estimated that between 250 to 300 illegal aliens were living at the facility. Utilities to the building were registered under the name AWS. Officers with the Lake Charles Police Department stated that there had been a large number of traffic accidents and DUI's involving illegal aliens without identification and insurance who reported 5505 Opelousas Street as their address. Sergio Alire was considered to be the company's liaison to the workers.

In an investigation separate from Border Patrol, ICE agents received information from an anonymous source on May 1, 2006, advising that AWS was housing between 150 and 200 Hispanic males in a commercial building, located at 5505 Opelousas Street. The nationality of the males included Mexican, Honduran, El Salvadoran, Puerto Rican, and Dominican. The immigration status of the males included legal permanent residents, illegal aliens, and prior deports. Information provided to ICE agents indicated there were approximately 100 sleeping cots throughout the building and four trailers on the side of the building, also containing sleeping quarters. A security guard was on duty at the commercial building and no dogs or weapons were at the location, according to the anonymous source. Sergio Alire was employed by AWS as a supervisor/overseer/recruiter of the Hispanic males. Alire was reportedly paid $4,000.00 a week to recruit employees for AWS. Alire's business cards showed he was employed by R&R Contractor Services, LLC, P.O. Box 364, 10523 Highway 105, Melville, Louisiana. Alire frequented Hispanic stores and Wal-Mart in order to solicit

employees. AWS hired the recruited individuals to work for various companies throughout the Lake Charles area, including the Dunham Price Group. Alire provided safety rules and regulations for R&R to the employees in Spanish and English, along with his business card.

As the investigation continued through May 2006, ICE agents learned that, in addition to recruiting the illegal workers, Alire was responsible for overseeing the daily operations of the employed aliens. Surveillance frequently observed Alire at the Opelousas site. Transportation of employees to and from the various work sites was provided by the employer and consisted of several different buses. There were two main shifts for the workers, the first beginning at 5:00 A.M. daily. In addition to the aliens housed on Opelousas Street, one bus traveled from the Sunrise Inn Motel, where approximately 50 to 60 Hispanic males resided, to and from three area petrochemical plants (including Citgo, Conoco-Phillips, and SASOL North America). Another bus would make trips, beginning around 5:00 A.M., to and from Opelousas Street to the Dunham Price Cement Plant, usually transporting between 80 and 100 Hispanic males.

The anonymous source further advised ICE agents that three Hispanic females, Delmi Arita, Olga Moreira, and Marta Madonado, resided at 317 Calcasieu Street, Lake Charles, Louisiana, and the females would prepare and deliver meals to Opelousas Street twice a day. Surveillance confirmed that a vehicle registered to Alire would deliver the meals.

During the course of the investigation, numerous "trash runs" were conducted, revealing numerous documents illustrating pay scales, names of employees, housing situations, shift assignments, status of workers (to include day or night shift, laid off, fired, vacation, went to Mexico not coming back, etc), a hand-written document stating "nine guys not working at the camp, 117 in the camp, 36 guys live outside the camp," and AWS's client accounts, billing and employees.

6

Additionally, a document was located titled "Lake Charles Camp Dissolution" showing the building lease terminated on November 18, and detailed outstanding debt in the amount of $24,037.00, including the building lease ($4,000.00), Trailer DeMobe ($6,559.00), bed tear down, clean-up, and removal of showers and toilets ($7,500.00), rent storage for inventory ($1,200.00) and total camp dissolution ($39,296.00 minus $4,000.00 deposit, equals $35,296.00). Another document from AWS/R&R, All Bills Outstanding, showed Amy Taylor associated with a $100.00 bill for auto repairs. (A vehicle registered to Taylor was observed on numerous occasions at Opelousas Street.) Townley, one of the owners of International Workforce Solutions, is referenced with a $3,700.00 bill for a mini van. Documents also show signatures by Taylor for petty cash expenses and reports. The expenses include automotive gasoline, employee meals, supplies, and janitorial supplies. Documents were also found for American Workforce Solutions, which revealed that Smith and Adams appeared to be receiving monthly draws totaling over $4,000.00 each.

At trial, six illegal aliens harbored by the defendants testified as to their respective immigration status and how they came to work for the defendants.[2] Two other individuals, Adelimiro Camara-Pineda and Romeo Galvez-Roblero, were arrested and admitted to being illegal and working for Sergio Alire. Law enforcement testimony at trial also established a cross-section of fourteen (14) workers traveling on the bus from the camp to Dunham Price were also found to be in the United States illegally.

Payroll spreadsheets were introduced at trial with hundreds of Hispanic names reflecting the

---

[2] Sergio Alire, recruiter; Delmy Aracely Arita-Lara, cooked meals for illegal workers at the warehouse and sheltered by the defendant; Gerardo Ortega Ramos-Pastor ("Jerry Ramos"), security at the warehouse; Luis A. Pinto, illegal worker; Elmer Antonio Caballer-Quintanilla, illegal worker; and Hugo Adalid Pinto-Galdamez, illegal worker.

7

pool of workers at any given time. Although there was testimony that not *everyone* lived at the "camp" on Opelousas Street, the same testimony established most of the immigrant workers had to because they had no other place to go. This was a "camp" equipped to house over one hundred workers at a time, and the testimony was clear from everyone who worked there, including Amy Taylor, Bruce Slinker, Jerry Ramos and Jack Ewing – an overwhelming majority of the residents were illegal.

Trial testimony also revealed that Alire hired mostly illegal workers. Sergio Alire's testimony corroborated the other testimony, that a high percentage of the residents at the camp were illegal because that is who he hired – undocumented Hispanic people.

Brenda and Tricia Frame, employees of RodneyRyder, also testified at trial there was little, if any, paperwork on these illegal workers. Some files had nothing, while others had only preliminary information requested of each worker on a form written in Spanish and handed to them as they signed up for work. This information was analyzed by James Malooley, an Immigration and Customs Enforcement (ICE) Intel Specialist. Of all the workers employed by the "Alliance," 169 names had enough information to analyze. Mr. Malooley's conclusion was that 10 appeared to be in the United States lawfully, while 159 appeared to be illegal. This conclusion was based on an analysis and cross-reference of the information provided, with information kept on several private databases and the Central Indexing System. While Mr. Malooley admitted the preferred method and only absolute way to definitely determine status would be by fingerprints or papers, both of which could not be obtained, his testimony also corroborates the other testimony and facts in this case.

Finally, the Government asserts that there are general admissions by all parties, including the defendants themselves, which further establishes what was obvious – this case involved the

harboring of over one hundred illegal aliens. Almost all of the men residing at the camp were Hispanic, and very few spoke English. Translators like Jerry Ramos and Sergio Alire were necessary in communicating and maintaining control.

The evidence contained in the PSR and introduced at trial, including relevant conduct, is sufficient to establish that Townley and his co-defendants harbored over 100 illegal aliens and the 9-level enhancement is warranted. This objection is OVERRULED.

Townley also objects to ¶ 41. Townley argues that he should receive a downward adjustment for a mitigating role in the offense. § 3B1.2. Mitigating Role states:

> "Based on the defendant's role in the offense, decrease the offense level as follows:
>
> **(a)** If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
>
> **(b)** If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
>
> In cases falling between (a) and (b), decrease by 3 levels.
>
> USSG, § 3B1.2, 18 U.S.C.A.

The advisory Sentencing Guidelines provide for a reduction in the base offense level of a "minor" or a "minimal" participant. U.S.S.G. § 3B1.2. To merit a reduction under § 3B1.2, the defendant must have been "substantially less culpable" than the average participant. § 3B1.2, comment. (n. 3(A)). *United States v. Guzman-Valdez*, 283 Fed.App'x. 229 (5th Cir. 2008). To be eligible for a minor role adjustment, a defendant "must have been peripheral to the advancement of the illicit activity." *United States v. Miranda*, 248 F.3d 434, 447 (5th Cir.2001). The burden is on the defendant to establish his entitlement to the reduction by a preponderance of the evidence. *Burton v. United States*, 237 F.3d 490, 503 (5th Cir.2000).

Investigation by ICE agents confirmed information received from the source that the Hispanic male employees were paid at the Opelousas Street site every Friday beginning between 4:30 p.m. and 5:00 p.m. Wade Townley was responsible for organizing cash checking for the employees. On Friday, two females would arrive at the Opelousas Street compound with a cash box. Frequently on Fridays Alire would arrive at Opelousas Street with a large stack of envelopes, believed to be paychecks, and leave empty-handed. Townley would also send certain people to Opelousas Street to cash payroll checks. The Hispanic employees would enter the facility, then would be observed leaving the building counting and/or carrying U.S. currency. Sources indicate Townley would send approximately $130,000.00-$150,000.00 in U.S. currency to cash the checks. The cash checking service was necessary, as the illegal aliens could not cash their paychecks at a legitimate bank. Identification was not required for the cash checking service, though a small fee was charged for the service. The check cashing service was necessary as the illegal aliens could not cash their checks at local banks due to their status and lack of identification. This checking cashing operation was an integral part of this scheme. Accordingly, the defendant is not entitled to a reduction for a mitigating role. This objection is OVERRULED.

Townley objects to ¶44. While he agrees that Provisional Fund's 2% check cashing fee totaled, $70,847.56, he argues that this is a gross sum, not a net figure after expenses. U.S.S.G. § 2S1.3 provides for a base offense level of six together with the levels from the table in section 2F1.1 corresponding to the value of the funds.[3] Additionally, this section also provides for an additional two point increase if the defendant knew or believed that the funds were intended to promote

---

[3] *Id.* at § 2S1.3.

unlawful activity.[4] In the Application Notes to § 2S1.3, "value of the funds" is defined as "the amount of the funds involved in the structuring or reporting conduct." *United States v. Keleta* 2009 WL 153211, 3 (C.A.D.C.,2009). The amount used by Probation to determine the value of the funds for the purpose of the statutory reporting requirement is correct. This objection is OVERRULED.

Townley argues that the exact number of illegal aliens was not proven at trial. He cites *Apprendi v. New Jersey*, 120 S.Ct. 2348 (2000) and *Blakely v. Washington*, 124 S.Ct. 2531 (2004) for the premise that it is unconstitutional to increase his sentence, after a jury trial, based upon facts not proven to the jury. This argument presumes that this court agrees that the Government did not prove that the defendant's activities involved over 100 illegal aliens. The court does not agree with this assumption and finds that the evidence did establish over 100 illegal aliens. Additionally, the statutory maximum in this case is 120 months, but the guideline range is 41 to 51 months, so *Apprendi* does not apply.

The court applies a lesser burden of proof at sentencing than does the jury in deciding guilt or innocence. *United States v. Rodriguez* 2008 WL 5206876, 13 ( 5th Cir. ,2008) *United States v. Duhon*, 541 F.3d 391, 395-96 (5th Cir.2008). The Government bears the burden of proving by a preponderance of the relevant and reliable evidence that the facts support a sentencing enhancement. *United States v. Rodriguez*, 523 F.3d 519, 524 (5th Cir.2008). The Government has sufficiently met their burden in this case. The defendant's objection is OVERRULED and the 9-level sentencing enhancement shall remain unchanged.

Considering the foregoing rulings on the defendant's objections, the guidelines calculations

---

[4] *Id.* at § 2S1.3(b)(1).

contained in the PSR shall remain unchanged.

Lake Charles, Louisiana, this 19 day of March, 2009.

/s/ Patricia Minaldi
PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE